UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION
CIVIL ACTION NO. 4:23-CV-00008-GNS-HBB

SCOTT WADE and JENNIFER WADE                                              PLAINTIFFS

v.

FORD MOTOR COMPANY                                                         DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment (DN 75) and Defendants' Motions to Exclude Expert Testimony (DN 76, 77). The motions are ripe for adjudication.

### I.   STATEMENT OF FACTS AND CLAIMS

On December 7, 2021, Scott Wade ("Wade") was riding in the front passenger seat of a Ford F-150 pickup truck ("the F-150"), travelling westbound in the right lane of the Wendell H. Ford Western Kentucky Parkway near mile marker 53. (Rentschler Report 2, DN 77-9). A Dodge Durango travelling in the opposite direction crossed the parkway's median, collided with a Mack truck, and ultimately hit the F-150. (Sicher Report 2, DN 75-7). One passenger in the Durango was killed, and the other occupants were seriously injured. (Police Report 2-3, DN 75-3). Wade and the driver of the F-150 were also injured. (Police Report 2-3).

During the crash, the bottom of Wade's seat deformed, slack was introduced into his seatbelt, and the seatbelt tore into two pieces. (Sicher Report 3-4, 9). Wade claims that he "submarined," or slipped under, his seatbelt's lap belt. (Rentschler Report 2; Pls.' Resp. Def.'s Mot. Summ. J. 2-3, DN 78). Defendant Ford Motor Company ("Ford") contends that Wade was

1

wearing his seatbelt incorrectly. (Pls.' Resp. Def.'s Mot. Summ. J. 2-3). Regardless, Wade suffered broken bones, bruising, and significant internal injuries. (Def.'s Mot. Summ. J. Ex. 2, at 1, DN 75-4).

Wade brought claims against Ford for negligence based on design and manufacturing defects and for negligence per se. (Compl. ¶¶ 9-38, DN 1-3). Wade's wife, Jennifer, also brought a claim for loss of spousal consortium. (Compl. ¶¶ 42-43). In addition to compensatory damages, the Wades also seek punitive damages. (Compl. ¶¶ 39-41).

Ford has moved for summary judgment on all claims and on the issue of punitive damages. (Def.'s Mot. Summ. J. 1, DN 75). Ford has also moved to exclude the testimony of Wade's experts. (Def.'s Mot. Exclude Sicher 1, DN 76; Def.'s Mot. Exclude Rentschler 1, DN 77). Wade opposes each of these motions. (Pls.' Resp. Def.'s Mot. Summ. J. 1; Pls.' Resp. Def.'s Mot. Exclude Sicher 1, DN 79; Pls.' Resp. Def.'s Mot. Exclude Rentschler 1, DN 80).

## II.    JURISDICTION

The Court has jurisdiction over this matter based on the diversity of the parties. *See* 28 U.S.C. § 1332.

## III.    DISCUSSION

### A.    Defendant's Motion for Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] party moving for summary judgment may satisfy its burden [of] show[ing] that there are no genuine issues of material fact simply 'by pointing out to the court that the [non-moving party], having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.'" *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005) (quoting

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)). Similarly, the movant may meet its burden by offering evidence negating an essential element of the non-moving party's claim. *See Dixon v. United States*, 178 F.3d 1294, 1999 WL 196498, at *3 (6th Cir. 1999).

After the movant either shows "that there is an absence of evidence to support the nonmoving party's case," or affirmatively negates an essential element of the non-moving party's claims, the non-moving party must identify admissible evidence that creates a dispute of fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). While the Court must view the evidence in a light most favorable to the non-moving party, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). "The mere existence of a scintilla of evidence in support of the [moving party's] position [is] [] insufficient; there must be evidence on which the jury could reasonably find for the [moving party]." *Anderson*, 477 U.S. at 252.

### 1. *Design Defect*

Wade claims that the F-150's restraint system and its individual components—the seat, seat belt, and seat belt load limiter—were designed in a defective manner. (Pls.' Resp. Def.'s Mot. Summ. J. 2-3). In Kentucky,[1] the standard for imposing liability for the sale of a defective product "is whether the product is 'in a defective condition unreasonably dangerous to the user or consumer.'" *Morales v. Am. Honda Motor Corp.*, 151 F.3d 500, 506 (6th Cir. 1998) (quoting

---

[1] The parties are seemingly in agreement that Kentucky law applies to Wade's design defect claim. (*See* Def.'s Mot. Summ. J. 6-8 (citing interpretations of Kentucky law by both state and federal courts to support its argument for summary judgment on Wade's design defect claim); Pls.' Resp. Def.'s Mot. Summ. J. 4-10 (same)). In cases where jurisdiction is based upon diversity of citizenship, the substantive law of the forum applies. *See Hanna v. Plummer*, 380 U.S. 460, 465 (1965).

3

*Montgomery Elevator Co. v. McCullough*, 676 S.W.2d 776, 780 (Ky. 1984)). "In cases of defective design, the difference between strict liability and negligence 'is of no practical significance so far as the standard of conduct required of the defendant is concerned. In either event the standard required is reasonable care.'" *Est. of Bigham v. DaimlerChrysler Corp.*, 462 F. Supp. 2d 766, 771 (E.D. Ky. 2006) (quoting *Jones v. Hutchinson Mfg., Inc.*, 502 S.W.2d 66, 69-70 (Ky. 1973)).

When a plaintiff does not assert that a defective design caused his injuries but instead argues, as Wade does here, that defective design caused his injuries to occur "above and beyond what should have befallen" a person in his circumstances, the plaintiff brings a "crashworthiness" claim. *Id.* (quoting *Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 41 (Ky. 2004), *as amended* (June 14, 2004)). To succeed on a crashworthiness claim, a plaintiff must show: "(1) an alternative safer design, practical under the circumstances; (2) proof of what injuries, if any, would have resulted had the alternative, safer design been used; and (3) some method of establishing the extent of enhanced injuries attributable to the defective design." *Gregory*, 136 S.W.3d at 41.

Thus, the presentation of "competent evidence of some practicable, feasible, safer, alternative design" is integral to Wade's claim. *Id.* at 41-42 (quoting *Gray v. Gen. Motors Corp.*, 133 F. Supp. 2d 530, 535 (E.D. Ky. 2001), *aff'd*, 312 F.3d 240 (6th Cir. 2002)); *see also McCoy v. Gen. Motors Corp.*, 47 F. Supp. 2d 838, 840 (E.D. Ky. 1998) (granting summary judgment because "[t]he plaintiff . . . has failed to produce any evidence of a practicable, safer, alternative design"), *aff'd*, 179 F.3d 396 (6th Cir. 1999). This evidence must be in the form of expert testimony if "a proper understanding . . . requires scientific or specialized knowledge and . . . cannot be determined intelligently from testimony on the basis of ordinary knowledge." *Garvin*

4

*v. Ethicon, Inc.*, 616 F. Supp. 3d 658, 670 (W.D. Ky. 2022) (quoting *Commonwealth v. Robbins*, 421 S.W.2d 820, 824 (Ky. 1967)).

"[E]vidence or 'proof that technology existed, which if implemented would feasibly have avoided a dangerous condition, does not alone establish a defect.'" *Lambert v. G.A. Braun Int'l, Ltd.*, No. 3:14-CV-00390-JHM, 2016 WL 3406155, at *2 (W.D. Ky. June 17, 2016) (quoting *Est. of Bigham*, 462 F. Supp. 2d at 776). Instead, plaintiffs "must show something more than that it was 'theoretically probable that a different design would have been feasible.'" *Brock v. Caterpillar, Inc.*, 94 F.3d 220, 224 (6th Cir. 1996) (quoting *Ingersoll-Rand Co. v. Rice*, 775 S.W.2d 924, 928 (Ky. App. 1988)); *see also Garvin*, 616 F. Supp. 3d at 670 ("[A]n alternative must be 'feasible.' And an alternative design 'must be properly analogous to the product at issue.'" (internal citation omitted) (citation omitted)).

Whether a plaintiff has provided evidence of a feasible alternative design is a question of law and is therefore appropriate for consideration at the summary judgment stage. *See Burton v. Ethicon Inc.*, No. CV 5:20-280-DCR, 2021 WL 1725514, at *2-3 (E.D. Ky. Apr. 30, 2021) (considering whether plaintiff has identified alternative designs at summary judgment stage); *Trent v. Ford Motor Co.*, 2 F. Supp. 3d 1022 (W.D. Ky. 2014) (same); *Garvin*, 616 F. Supp. 3d at 669-70 (same).

In this instance, Wade has failed to offer an alternative design to the F-150's restraint system as a whole or any of its individual components. Wade's restraint system expert, Larry Sicher ("Sicher"), referenced several other late model automobiles in his report and deposition, but did not show that the designs of these automobiles' restraint systems varied from that of the F-150 truck. First, Sicher noted a 1994 Volvo 850 station wagon and a 1999 Saab 9-3 sedan in his report, but only as examples of cars with seat ramps and only in the captions of photos. (Sicher

Report 11-12). Sicher acknowledged that the front passenger seat of the F-150 also had a seat ramp, or at least a seat ramp-like structure. (Sicher Dep. 66:2-15, 67:12-15, 68:24-69:5, 114:21-115:11, Jan. 28, 2025, DN 79-2). He did not differentiate the seat ramps of the Volvo 850 and Saab 9-3 from that of the F-150, nor did he explain how either vehicle represented a feasible alternative. (Sicher Report 11-12). Therefore, these are not examples of *alternative* designs that would satisfy Wade's evidentiary burden.

Similarly, Sicher mentioned the seat design of the 1996 Ford Contour/Mercury Mystique, which included a seat ramp. (Sicher Report 13; Sicher Dep. 15:24-16:6, 27:10-12). Again, however, Sicher did not differentiate between this design and that of the F-150. *Id.* Sicher instead cited the Ford Contour to show that "Ford is aware of and is aware of the importance of anti-submarine seats, and that was well before the building and the manufacture of our subject vehicle." (Sicher Dep. 16:2-5). This does not show that the Contour/Mystique is an alternative, as Sicher pointed to no difference between the seat ramp of the Contour/Mystique and that of the F-150. Sicher also discussed the seat ramps in U.S. military vehicles that use CCOPS, a restraint system that he helped design, but he failed to differentiate CCOPS's "anti-submarining seat ramp design" from that of the F-150. (Sichler 29:24-30:6).

Sicher comes the closest to identifying a feasible alternative to the F-150's seatbelt load limiter when discussing the 2009 Toyota Corolla. In his report, Sicher stated that the load limiter in the Corolla "required more than 1,000 pounds of load" before it introduced slack into an occupant's seatbelt, compared to the "approximately 350 pounds" required by the F-150's load limiter, showing a clear difference between the two. (Sicher Report 15). He also discussed, in both his report and his testimony, the testing he performed on the Corolla load limiter and how its characteristics differ from those of the F-150 load limiter. (Sicher Dep. 95:4-12; Sicher Report

6

15). Sicher, however, specifically testified that he was not offering the Corolla load limiter as an alternative design. (Sicher Dep. 95:9-12, 95:21-23 ("I have not tried to establish an alternative like that . . . . Again, I'm not going to talk about design requirements. I'm not going to point to a specific design, no.")).

In his response brief, Wade raises three arguments as to why Sicher's testimony did present a feasible alternative design. First, Wade argues that Sicher offered examples of feasible alternative designs and that "[d]efendant's approach to separately analyze each system failure ignores Mr. Sicher's testimony that he found multiple defects in the F-150's occupant protection system that worked together to create Mr. Wade's injuries." (Defs.' Resp. Pl.'s Mot. Summ. J. 6, 6 n. 5). Indeed, Sicher did thoroughly detail how, in his opinion, the elements of the F-150's occupant restraint system failed and how these failures combined to cause Wade's injuries. (Sicher Report 3, 9, 13, 16-18; Sicher Dep. 60:1-9, 120:6-121:3). This analysis, however, does not point to any *alternative* designs.

Identifying defects is only one part of a design defect claim. Other than identifying defects, Sicher failed to identify a feasible alternative design that did not have these defects. Wade states that Sicher's testimony "identifying" the 1994 Volvo 850 Wagon, the 1999 Saab 9-3, and the 1996 Ford Contour/Mercury Mystique as "alternative" designs was "[n]otably absent" from Ford's brief. (Pls.' Resp. Def.'s Mot. Summ. J. 6). This is a mischaracterization of Sicher's testimony. In his report, Sicher, as discussed above, identifies the Saab and Volvo only as examples of vehicles with seat ramps, as reflected in the captions of photos of the vehicles. (Sicher Report 11-12). Sicher's report does not analyze how either vehicle compares to the F-150 or explains how they are feasible alternatives.

Discussion of these "alternatives" in Sicher's deposition testimony is similarly sparse. Sicher discusses the testing he performed on "Volvo load limiters" and the results of that testing, but never specifies if those limiters were from the 1994 Volvo 850 Wagon or what specifically about their design was different from the Ford's load limiters. (Sicher Dep. 48:12-49:8, 92:8-24). The Contour/Mystique is discussed in even less detail. Sicher mentioned materials he relied on, stating that some Ford brochures about the model "made it into his report." (Sicher Dep. 15:18-21). When asked how the Contour/Mystique related to his opinions, however, Sicher answered that it showed "notice and that Ford is aware of . . . the importance of anti-submarine seats . . . ." (Sicher Dep. 15:24-16:6). Neither the 1999 Saab 9-3 nor any other Saab was mentioned in Sicher's deposition.

Wade also suggests that Sicher identified an alternative load limiter design in that of the 2009 Toyota Corolla. (Pls.' Resp. Def.'s Mot. Summ. J. 7). As noted above, Sicher discussed how the Corolla load limiter differs from that of the F-150 but did not opine that Ford feasibly could have used the design of the 2009 Corolla load limiter in the 2018 F-150. To the contrary, Sicher specifically disclaimed offering the design of the Corolla's load limiter as an alternative design. (Sicher Dep. 95:9-12, 95:21-23). When asked if he was proposing any of the load limiter designs as alternatives, Sicher responded: "[a]gain, I'm not going to talk about specific design requirements. I'm not going to point to a specific design, no." (Sicher Dep. 95:18-23).[2]

---

[2] Even if Sicher had identified the Corolla load limiter as an alternative design in his report, any such identification is negated by Sicher's disclaimer in his deposition. The contents of Sicher's expert report would be inadmissible hearsay at trial. *Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 729 (6th Cir. 1994); *Momeni-Kuric v. Metro. Prop. & Cas. Ins. Co.*, No. 3:18-CV-00197-RGJ, 2019 WL 3416677, at *9 (W.D. Ky. July 29, 2019); *Osborne v. Pinsonneault*, No. 4:07-CV-002-JHM, 2009 WL 1046008, at *4 (W.D. Ky. Apr. 20, 2009) (citing *Wright v. Premier Elkorn Coal Co.*, 16 S.W.3d 570, 572 (Ky. App. 1999); *Engebretsen*, 21 F.3d at 729). Thus, if Sicher's deposition testimony conflicts with or negates a portion of his report, then the Court, in determining whether summary judgment is appropriate, should look to the content of the

Wade cites *Estate of Bigham v. DaimlerChrysler Corp.* for the proposition that success in a design defect action requires that the plaintiff "'specifically identif[y]' multiple 'cognizable alternative designs capable of at least minimal vetting.'" (Pls.' Resp. Def.'s Mot. Summ. J. 8 (quoting *Est. of Bigham*, 462 F. Supp. 2d at 776-77)). While this is a correct statement of the law, the facts in *Bigham* illustrate exactly why Sicher's testimony does not amount to evidence of a feasible alternative design sufficient to survive summary judgment. In *Bigham*, a driver was killed when a portion of his Jeep's roll cage broke during a rollover accident and inflicted severe blunt force trauma to his head. *Est. of Bigham*, 462 F. Supp. 2d at 768-70. The driver's estate brought a design defect claim, arguing that the roll cage and other components of the vehicle, including the seat and seat belt, were defective. *Id.* On the defendant-manufacturer's motion for summary judgment, the court determined that the plaintiff offered insufficient evidence of a feasible alternative design, despite the fact Bigham's experts offered far *more* detailed testimony about alternatives than Wade's experts have here. *Id.* at 773. For example, in discussing alternative roll cage designs, the engineering expert in *Bigham* stated: "Other means of mounting the side window seals are available to Chrysler engineers. A tab could have been welded to the tube to mount the window frame. A strap or clamp could have been attached around the tube without penetrating the walls of the tube." *Id.* at 774. In discussing alternative seat belt mounts, the same expert stated: "I don't have one right now, but there are alternate designs . . . [the belt] can be mounted to the floor. It could be mounted to preferably a vertical section of the floor which is stiff in the up-and-down direction. It could be mounted in a better way to the seat frame." *Id.* These proposed alternatives are far more specific than any proposed by Sicher. *Id.* at 776. The *Bigham* court stated

---

deposition. Sicher specifically disclaimed offering the Corolla load limiter as an alternative design.

9

that these proposals did "not even approach[] the level of proof required to survive summary judgment . . . ." *Id.* at 773. Accordingly, Sicher's discussion of these other designs is clearly insufficient to establish any of them as alternatives.

Wade's second argument is that Ford "ignored the testimony of Plaintiffs' expert Dr. Rentschler [("Rentschler")] who concluded that an alternative design would have prevented Mr. Wade's injuries." (Pls.' Resp. Def.'s Mot. Summ. J. 8). While perhaps true, an opinion that an alternative design would have prevented Wade's injuries is no substitute for the required proof that there was, in fact, a feasible alternative. In a claim under the crashworthiness doctrine, the absence of evidence of either an alternative design or that the alternative design would have lessened the plaintiff's injuries is fatal to the claim. *See Gregory*, 136 S.W.3d at 41. Additionally, Rentschler's opinion on this issue is purely speculative because Sicher did not present any alternative design. It takes no special expertise to conclude that *some* alternative design could have prevented Wade's injuries. The same is true for every design defect claim—there is some theoretical design that could always be safer. That is why the alternative design must be feasible and this feasibility, in turn, is why a plaintiff's expert must offer a specific alternative design. Specificity allows a jury to decide whether a proposed design was feasible. Rentschler's testimony about injury prevention rests on no specific alternative design identified by Sicher. Therefore, it holds no weight. *See Burgin v. Ethicon*, No. 3:20-CV-111-RGJ, 2023 WL 5985524, at *24 (W.D. Ky. Sept. 14, 2023) (a court need not examine the further elements of a design defect claim when no alternative design was presented); *Millea v. Ford Motor Co.*, No. 1:11-CV-00109-TBR, 2014 WL 1603598, at *2 (W.D. Ky. Apr. 21, 2014) (without testimony establishing an alternative design, a plaintiff is "unable to establish" proof of injury prevention), *vacated on other grounds*, No. 1:11-CV-00109-TBR, 2014 WL 3740524 (W.D. Ky. July 30, 2014); *Est. of Bigham*, 462 F. Supp. 2d at 776-77 (it

10

is "extremely difficult, if not impossible" to examine injury prevention "without first presenting a cognizable alternative design").

Third, Wade argues that Sicher has proposed an alternative design because Ford's expert, Roger Burnett ("Burnett") referred to the seatbelt in the 2009 Corolla as a "safer alternative design" that Sicher proposed. (Pls.' Resp. Def.'s Mot. Summ. J. 8). Wade's argument fails for several reasons. First, the law does not rely upon the invocation of "magic words," in expert testimony, but instead looks to its substance. *Thompson v. Underwood*, 407 F.2d 994, 997 (6th Cir. 1969) ("Obviously, a court should not disregard the substance of a doctor's testimony merely because he fails to use the magic words 'reasonable medical certainty.'"); *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1217 (6th Cir. 1988) (Jones, J. concurring) (quoting *Thompson*, 407 F.2d at 997); *Humility of Mary Health Partners v. N.R.L.B.*, No. 09-CV-0453, 2010 WL 796824, at *10 (N.D. Ohio Mar. 3, 2010) ("Courts do not generally require that particular magic words be used because it is the *substance* of statements that is paramount."). Burnett's mere reference to the 2009 Corolla's seat belt as an "alternative design" does not change Sicher's report and deposition testimony, which not only failed to establish the Corolla as an alternative design but also specifically disclaimed offering it as an alternative design. (Sicher Dep. 95:18-23).

Further, Burnett's testimony does not independently establish the seat belt in the 2009 Corolla as an alternative design. Again, merely referencing to something as an "alternative" does not make it so. If Burnett had detailed the differences between the load limiter in the 2009 Corolla and the F-150, then Wade could possibly point to that testimony as evidence of a feasible alternative design. Burnett, however, does not go into such detail and instead explains in his deposition why the Corolla load limiter is not a feasible alternative:

> [Y]ou can't take an element and arbitrarily change it . . . . [I]t's a system-level design.

11

> . . .
> [I]n the F-150 system [] it would provide too stiff of a shoulder belt.
> . . .
> [I]t has a load limiter that's set at a higher level. It's designed for its specific purpose, in its specific car, and [for] decade-older crash targets [] than the F-150.
> . . .
> [T]he passage of time has changed the goals of these systems. The system has to be designed around your componentry . . . . Your componentry is part of a system. [T]he airbag is designed to work with the stiffness of the belt that's chosen. The stiffness of the belt that is chosen is selected based on crash-testing targets, [those are] chosen based on field data. And that experience is different in '09[] than . . . in '18.
> . . .
> [Y]ou can't just put [a different load limiter] in an existing system without redesigning the system.

(Burnett Dep. 55:14-57:2, Apr. 25, 2025, DN 78-3).

In sum, Wade seeks to advance Burnett's testimony as proof that Sicher put forth a feasible alternative design. (Pls.' Resp. Def.'s Mot. Summ. J. 8). Burnett's explanation of why the Corolla was not a feasible alternative does not go to weight or credibility, but instead shows that Burnett did not acknowledge the Corolla as a feasible alternative.

Despite Wade's attempts to argue otherwise, he has not identified any alternative designs, much less any feasible alternative designs. Under the crashworthiness doctrine, an expert does not present an alternative vehicle design by simply naming other vehicles; proposals must be specific and include an explanation of why they would have been feasible to implement in the vehicle at issue. *Brock*, 94 F.3d at 224-25 ("a plaintiff must show something more than that it was 'theoretically probable that a different design would have been feasible.'" (quoting *Ingersoll-Rand*, 775 S.W.2d at 928)); *Burgin*, 2023 WL 5985524, at *21 ("While plaintiffs are not required to produce a prototype of the alternative design, they must provide sufficiently detailed expert testimony to establish that a reasonable alternative design could have been practically adopted at the time of the sale." (quoting *Burton*, 2021 WL 1725514, at *2)); *Est. of Bigham*, 462 F. Supp.

12

2d at 776 (proof of an alternative design requires more than the "mere mention that alternative possibilities exist"); *see also Lambert v. G.A. Braun Int'l, Ltd.*, No. 3:14-CV-00390-JHM, 2016 WL 3406155, at *2-3 (W.D. Ky. June 17, 2016) (granting summary judgment for defendant on a design defect claim because plaintiff did not prove that the alternative design was feasible). Nowhere—not in Sicher's testimony or report, Rentschler's testimony or report, or even Burnett's testimony—is such a proposal made. Therefore, Wade has failed to identify an alternative design to the F-150's restraint system or any of its components.

Because Wade has failed to identify any alternative designs, he cannot prove a crucial element of his design defect claim. Accordingly, the summary judgment motion is granted as to Wade's design defect claim.

### 2. *Manufacturing Defect/Negligence Per Se*

Wade has abandoned both his manufacturing defect and negligence per se claims. (Pls.' Resp. Def.'s Mot. Summ. J. 13 n.23). Accordingly, Ford's motion is granted as to these claims.

### 3. *Loss of Consortium*

Ford argues that loss of spousal consortium claim cannot succeed because Wade's underlying product defect claims fail. (Def.'s Mot. Dismiss 10). When there is no underlying claim, a plaintiff cannot succeed on a loss of consortium claim. *Burgett v. Troy-Bilt LLC*, 970 F. Supp. 2d 676, 687 (E.D. Ky. 2013) (citing *Boggs v. 3M Co.*, No. 7:11-CV-00057-ART-CJS, 2012 WL 3644967, at *12 (E.D. Ky. Aug. 24, 2012), *aff'd*, 527 F. App'x 415 (6th Cir. 2013)); *Norton v. Canadian Am. Tank Lines*, No. 3:06-CV-00411-JBC, 2009 WL 931137, at *2 (W.D. Ky. Apr. 3, 2009) (citing *Daley v. Reed*, 87 S.W.3d 247 (Ky. 2002); *Godbey v. Univ. Hosp. of Albert B. Chandler Med. Ctr., Inc.*, 975 S.W.2d 104, 106 (Ky. App. 1998)). Summary judgment has been

granted on each of Wade's underlying claims. Therefore, the loss of spousal consortium claim cannot survive, and this claim is also dismissed.

### 4. *Punitive Damages*

Finally, Ford seeks dismissal of Wade's "claim" for punitive damages. (Def.'s Mot. Summ. J. 10). In the Complaint, Wade characterizes punitive damages as a separate claim or "count." (Compl. ¶¶ 39-41). Despite this characterization, punitive damages are not an independent cause of action and are available only as a remedy for some torts. *See Smith v. Westlake Vinyls, Inc.*, 403 F. Supp. 3d 625, 635 (W.D. Ky. 2019) (quoting *Dalton v. Animas Corp.*, 913 F. Supp. 2d 370, 378 (W.D. Ky. 2012)); *Price v. AgriLogic Ins. Servs., LLC*, 37 F. Supp. 3d 885, 901 (E.D. Ky. 2014) (citing *Shibeshi v. Alice Lloyd Coll.*, No. 7:11-CV-00101-ART, 2011 WL 4970781, at *5 (E.D. Ky. Oct. 19, 2011)). Because all causes of action have been dismissed, there is no underlying tort for which Wade can be awarded punitive damages. Accordingly, Ford is granted summary judgment on the issue of punitive damages.

### B. Defendant's Motions to Exclude Expert Testimony

Ford has moved to exclude the testimony of Wade's design expert, Sicher, and Wade's kinematics expert, Dr. Andrew Rentschler. (Def.'s Mot. Exclude Sicher 1; Def.'s Mot. Exclude Rentschler 1). Because summary judgment has been granted in favor of Ford on all claims, these motions are denied as moot.

### IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1. Defendant's Motion for Summary Judgment (DN 75) is **GRANTED**, and Plaintiffs' claims are **DISMISSED WITH PREJUDICE**.

    2.      Defendant's Motions to Exclude (DN 76, 77) are **DENIED AS MOOT**.

    3.      The Clerk shall strike this matter from the active docket.

Greg N. Stivers, Chief Judge
United States District Court

November 13, 2025

cc:    counsel of record